## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL SPADAFINO, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>v.<br><br>CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES PLC; NOKIAN TYRES INC; NOKIAN TYRES U.S. OPERATIONS LLC; THE GOODYEAR TIRE & RUBBER COMPANY; PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; BRIDGESTONE CORPORATION; BRIDGESTONE AMERICAS, INC.; AND DOES 1-100,<br><br>                      Defendants. | **Case No.**  24-cv-01452<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michael Spadafino, on behalf of himself and all others similarly situated, brings this Class Action Complaint for damages and injunctive relief against named Defendants Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale des Établissements; Michelin North America, Inc.; Nokian Tyres plc; Nokian Tyres Inc; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.p.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc.; and unidentified Doe Defendants for violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and various state laws. All allegations herein other than those concerning Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1.      This action arises from a *per se* unlawful agreement among Defendants—some of the largest tire manufacturers in the United States and the world—to artificially increase, maintain, and fix the prices of new replacement tires for passenger cars, vans, trucks, and buses ("Replacement Tires") sold in the United States, from January 1, 2020 until the present (the "Class Period").

2.      On January 30, 2024, the European Commission ("EC") announced dawn raids at the premises of "companies active in the tyres industry in several Member States." The EC justified its dawn raids over suspicion that these companies "violated EU antitrust rules that prohibit cartels and restrictive business practices," specifically that price coordination took place amongst these companies.[1] Following the announcement of the raids, Defendants issued official statements confirming that they were subject to the EC inspections.

3.      Evidence that Defendants have entered into and maintained an unlawful

---

[1] European Commission, "Commission carries out unannounced antitrust inspections in the tyres sector" (Jan. 30, 2024), *available at* https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

agreement to increase prices of Replacement Tires includes: (i) Defendants' sudden and dramatic parallel price increases for Replacement Tires, which, absent a conspiracy to fix prices, ran contrary to their independent economic interests; (ii) EC dawn raids of Defendants to investigate unlawful price-fixing conduct involving tires; (iii) the high level of market concentration in the Replacement Tire market; (iv) significant barriers to entry in the Replacement Tire market; (v) lack of economic substitutes for Replacement Tires; (vi) standardization of Replacement Tires with a high degree of interchangeability; and (vii) the myriad opportunities that employees of Defendants had to conspire with one another to increase prices of Replacement Tires.

4.     Plaintiff seeks to represent a Class of individuals and entities that purchased Replacement Tires indirectly from Defendants at supracompetitive prices to recover damages, injunctive relief, and other relief as is appropriate, based on Defendants violations of the Sherman Act and various state laws. Plaintiff demands a trial by jury.

## JURISDICTION, VENUE, AND EFFECT ON INTERSTATE COMMERCE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the Class; and at least one member of the proposed Class is a citizen of a state different from that of one of Defendants. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and Section 16 of the Clayton Act, 15 U.S.C. § 26.

6.     This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

7.     Venue is proper within this District under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b), (c), and (d). During the Class Period, Defendants transacted business within this District

and/or have agents in and/or that can be found in this District, and a substantial portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendant and co-conspirator Michelin North America, Inc. at all relevant times was incorporated under the laws of the State of New York.

8.     Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

9.     During the Class Period, Defendants manufactured, sold, and shipped Replacement Tires in a continuous and uninterrupted flow of interstate commerce, which included sales of Replacement Tires in this District, advertisement of Replacement Tires in media in this District, and employment of sales personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

## PARTIES

### A. Plaintiff

10.     Plaintiff Michael Spadafino is a resident of New York and this District. During the Class Period, Plaintiff bought Replacement Tires manufactured by one or more of the Defendants, including Continental, in the State of New York.

### B. Defendants

#### 1. Continental Defendants

11.     Defendant Continental Aktiengesellschaft ("Continental AG"), is a German company with its headquarters at Vahrenwalder Strasse 9, 30165 Hannover, Germany. Continental AG has four group sectors: Automotive, Tires, ContiTech, and Contract Manufacturing. The Tires group has five business areas: (i) Original Equipment, (ii)

Replacement APAC, (iii) Replacement EMEA, (iv) Replacement the Americas, and (v) Specialty Tires. In 2022 Continental AG reported that its "Tires group sector achieved a particularly positive result, even surpassing expectations with an adjusted EBIT margin of 13.1 percent."[2] In 2022, Continental AG reported sales of €14 billion (over $15 billion) globally for the Tires group. Continental AG manufactures tires in Europe, the United States, and China for sale in the United States and elsewhere.

12.     Defendant Continental Tire the Americas, LLC ("Continental U.S.") is a limited liability company incorporated under the laws of Ohio, with its principal place of business at 1830 MacMillian Park Drive, Fort Mill, SC 29707. Continental U.S. manufactures and distributes a complete line of passenger, light truck, and commercial tires for original equipment and replacement markets. Continental US sells its tires through independent tire dealers, car dealers, and mass retail companies across North America. Continental U.S. has manufacturing facilities across the United States, including in Barnseville, Georgia; Mt. Vernon, Illinois; Sumter, South Carolina; and Jackson, Missouri. Continental U.S. employs hundreds of individuals in its United States facilities.

13.     Continental AG and Continental U.S. are referred to collectively as "Continental."

### 2.  Michelin Defendants

14.     Defendant Compagnie Générale des Établissements ("CGEM") is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries. CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly-owned subsidiary that coordinates

---

[2] 2022 Chairman's Letter, Continental AG, available at
https://annualreport.continental.com/2022/en/shareholders/chairmans-letter.php.

all of the Group's manufacturing, sales, and research operations in France, and Compagnie

Financière Michelin ("CFM"), a wholly-owned subsidiary that owns most of the Group's

manufacturing, sales, and research companies outside of France and coordinates their operations.

15.     Defendant Michelin North America, Inc. ("Michelin North America") is a

corporation organized under the laws of the State of New York with its principal place of

business at One Parkway South, Greenville, SC 29615-5022. Michelin designs, manufactures,

and sells tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers,

farm equipment, heavy-duty trucks, and motorcycles. Michelin is one of the leading

manufacturers of tires in the United States. In 2022, Michelin had €10.92 billion (over $11.75

billion) in sales, 80% of which were generated in the United States. Michelin employs 23,000

people across 34 plants in the United States and Canada. Michelin has manufacturing facilities in

Alabama (light trucks and passenger tires), Indiana (car tires), Oklahoma (passenger tires), and

South Carolina (passenger tires and truck and bus tires).

16.     CGEM and Michelin North America are referred to collectively as "Michelin."

### 3.  Nokian Tyres Defendants

17.     Defendant Nokian Tyres plc is organized under the laws of Finland with its

principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres

plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide.

Nokian Tyres plc develops and manufactures tires for passenger cars, trucks, and heavy

machinery. In 2019, the company's net sales were $1.8 billion, and it employed some 4,700

people.

18.     Defendant Nokian Tyres Inc. is a corporation organized under the laws of the

State of Delaware. It is a wholly-owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an

indirect subsidiary of Nokian Tyres plc. In December of 2018, Nokia Tyres announced its new

headquarters located in Nashville, Tennessee, which would house Nokia Tyres' Vice President, along with members of the company's sales, customer service, IT, logistics, finance, and marketing teams. In 2017, Nokian Tyres announced it had opened a $360 million manufacturing facility located in Tennessee. The manufacturing facility produces car and light truck all season tires and all-weather tires for consumers in the United States and Canada.

19.     Defendant Nokian Tyres U.S. Operations LLC is a limited liability company organized under the laws of the State of Tennessee. It is a wholly-owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

20.     Nokian Tyres plc, Nokian Tyres Inc., and Nokian Tyres U.S. Operations LLC are referred to collectively as "Nokian Tyres."

### 4.  Goodyear

21.     Defendant The Goodyear Tire & Rubber Company ("Goodyear") is a corporation organized under the laws of the State of Ohio with its principal place of business at 200 Innovation Way, Akron, Ohio 44316-0001. Goodyear manufactures its products in facilities in 23 countries and has operations in most regions of the world. Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft, and Roadmaster brands. Approximately 86% of Goodyear's sales in 2022, 85% in 2021 and 84% in 2020 were for tire units. The principal channel for the sale of Goodyear and Cooper brand tires in the United States is a large network of independent dealers. Goodyear, Cooper, Dunlop, Kelly, and Mastercraft brand tires are also sold to numerous national and regional retailers, in Goodyear Company-owned stores in the United States, and through the wholesale channel, including through TireHub, LLC, Goodyear's national wholesale tire distributor in the United States, and a network of aligned U.S. regional wholesale tire distributors.

### 5. Pirelli Defendants

22.     Defendant Pirelli & C. S.p.A. ("Pirelli & C") is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli & C designs, manufactures, and distributes tires for cars, motorcycles, and bicycles. Pirelli & C has a commercial presence in over 160 countries and 19 manufacturing sites in 12 countries.

23.     Defendant Pirelli Tire LLC ("Pirelli Tire") is a limited liability company organized under the laws of Delaware with its principal place of business located at 100 Pirelli Drive, Rome, GA 30161. Pirelli Tire's facilities include a research and development center at its Rome, Georgia headquarters, as well as sales and marketing offices in New York City, Los Angeles, Detroit, Montreal, and Atlanta, and a flagship store in Los Angeles. The company manufactures, distributes, and markets original equipment and replacement tires for export and domestic car/motorcycle applications.

24.     Pirelli & C and Pirelli Tire are referred to collectively as "Pirelli."

### 6. Bridgestone Defendants

25.     Defendant Bridgestone Corporation is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all Group companies, including Bridgestone Americas ("BSAM"), Bridgestone China, Asia Pacific ("BSCAP"), Bridgestone Europe, Russia, Middle East, India, and Africa ("BSEMIA"), and Bridgestone Japan ("BSJP"). Bridgestone Corporation is the world's largest tire and rubber company.

26.     Defendant Bridgestone Americas, Inc. ("BSAM") is incorporated under the laws of Nevada with its principal place of business at 200 4th Ave, Suite 100, Nashville, Tennessee, 37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of

Bridgestone, Firestone, and associate brand tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries. BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.

27.     Bridgestone Corporation and BSAM are referred to collectively as "Bridgestone."

### 7.   Unnamed Co-Conspirators and Agents

28.     DOE Defendants 1–100 are other individuals or entities who engaged in the unlawful conduct as co-conspirators to Defendants. Plaintiff may amend this Complaint to allege the names of additional Defendants as they are discovered.

29.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

30.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

31.     Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

32.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

### A.  U.S. Tire Market

33.     Virtually all wheeled land vehicles in operation, whether off-road or on-road, use tires. This dependence makes the tire industry a critical component of the U.S. automobile industry. With nearly 9.2 million passenger and commercial vehicles being produced and almost 14 million vehicles being sold in the United States in 2022, the U.S. market calls for a large number of tires to be manufactured annually.

34.     Given the critical need for tires in all wheeled land vehicles, automobile tire manufacturers have existed in the United States for as long as there have been cars. For example, Defendant Goodyear began producing automobile tires in 1899, around the same time the first American car companies were founded.

35.     U.S. tire manufacturing has an annual economic footprint of $170.6 billion. The United States Tire Manufacturers Association ("USTMA") projected total U.S. tire shipments of 334.2 million units in 2023. The market for Replacement Tires in the United States was sized at approximately $61 billion in 2022.

36.     Manufactured tires can either be used in new cars ("Original Equipment Tires" or "OE" tires) or produced as dedicated Replacement Tires. There are differences between OE tires and Replacement Tires. OE tires are those tires that are specified by the vehicle manufacturer and are initially fitted to the vehicle when new. The car manufacturer works with tire companies to choose a tire that will meet any number of performance requirements for their brand-new vehicle. The manufacturer selects a tire that balances ride noise, handling, longevity, and fuel efficiency to achieve the overall characteristics that the vehicle manufacturer believes is important to the end-user. By contrast, Replacement Tires are selected by individual consumers as replacements for OE tires. This action alleges anticompetitive price-fixing conduct of

10

Replacement Tires.

**B.  Replacement Tire Prices Increased Significantly During the Class Period**

37.     For most of the 2010s, the price level of Replacement Tires was stable, changing slowly over time by small amounts. Over the last four years, however, the prices of Replacement Tires have seen dramatic increases, driven by lock-step price increases from the major U.S. Tire manufacturers, including Defendants. In 2023 it was reported that, "the average price of tires has risen 21.4% over the past two years, more than 70% higher than core inflation."[3] Prices for Replacement Tires have remained high despite easing inflation and dissipating effects of the COVID-19 pandemic. "As of June 2023, the industry average price paid . . . for tires was $220."[4]



**Figure 1. Producer Price Index by Commodity: Tires.[5]**

38.     The following table summarizes Defendants' price increases on passenger and light truck Replacement Tires between 2021 and 2023:

---

[3] Michael Grabell, "Overinflated: The Journey of a Humble Tire Reveals Why Prices Are Still So High," Pro Publica (May 3, 2023), *available at* https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices.
[4] "Tire Market: Top Brands & Retailers, Market Share, Retail Sales Data, & Trends in 2023," Traqline (Oct. 20, 2023), *available at* https://www.traqline.com/newsroom/blog/tire-market-top-brands-retailers-market-share-retail-sales-data-trends-in-2023/.
[5] Source: St. Louis Federal Reserve.

| Defendant | Effective Date | Price Increase |
|-----------|----------------|----------------|
| Michelin | February 1, 2021 | Up to 5% |
| Continental | March 1, 2021 | Undisclosed |
| Michelin | April 1, 2021 | Up to 8% |
| Goodyear | April 1, 2021 | Up to 8% |
| Pirelli | April 15, 2021 | Up to 7% |
| Bridgestone | May 1, 2021 | Up to 8% |
| Goodyear | June 1, 2021 | Up to 8% |
| Michelin | July 1, 2021 | Up to 6% |
| Continental | July 1, 2021 | Undisclosed |
| Pirelli | July 1, 2021 | Up to 6% |
| Goodyear | September 1, 2021 | Up to 8% |
| Michelin | September 1, 2021 | Up to 14% |
| Continental | October 1, 2021 | Undisclosed |
| Pirelli | October 1, 2021 | Up to 8% |
| Michelin | January 1, 2022 | Up to 12% |
| Goodyear | January 1, 2022 | Up to 12% |
| Continental | January 3, 2022 | Undisclosed |
| Pirelli | January 17, 2022 | Up to 10% |
| Continental | April 1, 2022 | Undisclosed |
| Michelin | April 1, 2022 | Up to 5% |
| Bridgestone | April 1, 2022 | Up to 10% |
| Pirelli | April 11, 2022 | Up to 10% |
| Continental | June 1, 2022 | Undisclosed |
| Michelin | June 1, 2022 | 5-12% |
| Pirelli | June 15, 2022 | Up to 10% |
| Goodyear | July 1, 2022 | Up to 10% |
| Bridgestone | July 1, 2022 | Up to 10% |
| Bridgestone | October 1, 2022 | Up to 9% |
| Continental | October 1, 2022 | Undisclosed |
| Michelin | January 1, 2023 | Up to 9% |
| Bridgestone | January 1, 2023 | Undisclosed |
| Pirelli | January 15, 2023 | Up 10% |

**Figure 2. Defendants' Price Increases During the Class Period.**

39.     Defendants effectuated several conspiratorial prices increases for Replacement

Tires during the Class Period. For example, Michelin increased prices on select Michelin and

BFGoodrich brand passenger and light truck Replacement Tires, as well as on select commercial

truck tires, up to 5%, effective February 1, 2021. It publicly claimed the price increases were

"due to changing business dynamics of the U.S. market."

40.    Around the same time, Continental increased prices on select passenger and light truck Replacement Tires in the U.S. within the Continental and General brands by an undisclosed amount, effective March 1, 2021.

41.    Soon thereafter, Michelin and Goodyear both increased prices on Replacement Tires, effective April 1, 2021. Michelin increased prices on select Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires up to 8%, publicly claiming the price increase was due to "changing business dynamics and rising costs of raw materials." Goodyear raised prices of its Goodyear, Dunlop, and Kelly-brand Replacement Tires by up to 8%.

42.    Pirelli also increased prices on passenger and light truck Replacement Tires in the United States at this same time, up to 7%, effective April 15, 2021. Pirelli publicly claimed the price increases were due to "higher price of raw materials and changing market conditions."

43.    Then Bridgestone increased prices on select Bridgestone and Firestone brand passenger and light truck Replacement Tires up to 8% in the United States and Canada, effective May 1, 2021. It publicly claimed the price increases were due to "increased business costs and other market dynamics."

44.    Goodyear then increased prices again on Goodyear, Dunlop, and Kelly consumer Replacement Tires by up to 8%, effective June 1, 2021. Goodyear publicly blamed the increase on "changing market dynamics in the industry and [a] reflect[ion of] the strong value of the Goodyear brands"—using identical wording from its April 1, 2021 price increase.

45.    Michelin, Continental, and Pirelli then implemented additional price increases on Replacement Tires, effective July 1, 2021. Michelin increased prices on certain aftermarket Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires by up to 6%.

Continental increased prices on select Continental and General brand passenger and light truck Replacement Tires by an undisclosed amount. Pirelli increased prices of passenger and light truck Replacement Tires by up to 6%, citing publicly the increases were due to higher price of raw materials and changing market conditions.

46.     Michelin and Goodyear again implemented price increases on consumer Replacement Tires, effective September 1, 2021. Michelin increased prices on certain aftermarket Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires by up to 14%. Goodyear increased prices on passenger and light truck Replacement Tires by up to 8%.

47.     Continental and Pirelli increased prices again on Replacement Tires, effective October 1, 2021. Continental increased prices on some Continental and General passenger and light truck Replacement Tires by an undisclosed amount. Pirelli increased prices on car and light truck Replacement Tires by up to 8%, publicly citing higher prices of raw materials and changing market conditions.

48.     The price increases for Replacement Tires continued into 2022. Michelin implemented price increases up to 12% on select Michelin, BFGoodrich, and Uniroyal passenger and light truck Replacement Tires, effective January 1, 2022. Similarly, Goodyear raised its prices on consumer Replacement Tires by up to 12% around the same time.

49.     Soon thereafter, Continental increased prices on select Continental and General passenger and light truck Replacement Tires by an undisclosed amount, effective January 3, 2023.

50.     A few weeks later, Pirelli increased its prices for car and light truck Replacement Tires by up to 10%, effective January 17, 2022.

51.     Continental, Michelin, and Bridgestone increased Replacement Tire prices again, effective April 1, 2022. Continental increased its price on select Continental and General passenger and light trucks Replacement Tires by an amount that varied across specific products by brand. Michelin increased prices by 5% on the majority of select passenger and light truck Replacement Tires. Bridgestone increased prices by up to 10% on non-winter Bridgestone, Firestone, and Fuzion passenger and light truck Replacement Tires.

52.     Soon thereafter, Pirelli increased its prices for Replacement Tires by up to 10%, effective April 11, 2022.

53.     Continental and Michelin each increased prices on tires, effective June 1, 2022. Continental increased its prices on Continental- and General-branded passenger and light truck Replacement Tires by an undisclosed amount. Michelin increased prices on the majority of its passenger and light truck Replacement Tires ranging from 5-12%.

54.     Pirelli increased its prices for car and light truck Replacement Tires by up to 10% soon thereafter, effective June 15, 2022.

55.     Then Goodyear and Bridgestone each increased prices by up to 10% on consumer Replacement Tires, effective July 1, 2022.

56.     Bridgestone and Continental each increased prices on tires, effective October 1, 2022. Bridgestone increased its prices on Bridgestone, Firestone, and Fuzion passenger and light truck Replacement Tires by up to 9%. Continental increased its price on select Continental and General passenger and light trucks Replacement Tires by an amount that varied across specific products by brand.

57.     Defendants' unlawful price increases continued into 2023. Michelin and Bridgestone each increased their Replacement Tire prices, effective January 1, 2023. Michelin

increased prices on select passenger and light trucks Replacement Tires by up to 9%.
Bridgestone increased its prices on passenger and light truck Replacement Tires by an
undisclosed amount.

58.     Soon thereafter, Pirelli increased its prices for car and light truck Replacement
Tires by up to 10%, effective January 15, 2023.

59.     Defendants' unlawful price increases are disproportionate to their increased costs.
For example, in its Q1 2022 earnings call on May 6, 2022, Goodyear's Chief Financial Officer
told investors "[Goodyear's] increase in the replacement tire prices more than offset [its] costs."

60.     Sales volume also did not suffer due to price increases, which would normally be
seen in a price-competitive market. For example, Continental's sales volume rose by 19.3% in
2022. Its annual report from that year indicates "agreements reached with customers on price
adjustments and to offset inflation-related effects had a positive impact on the sales performance
of the Automotive group sector."

### C.  Defendants Make Up a Significant Portion of the United States Replacement Tire Market

61.     Defendants are among the largest tire manufacturers in the world. Bridgestone is
the world's largest tire and rubber company, with about 130 manufacturing plants and R&D
facilities in 25 countries and sells products in more than 150 countries worldwide. Michelin has
nine R&D centers around the world, 123 production sites in 26 countries, a commercial presence
in 170 countries and 125,000 employees worldwide and does business on every continent.
Goodyear employs about 72,000 people and manufactures its products in 57 facilities in 23
countries around the world. Pirelli has 18 factories located in 12 countries, production capacity in
2022 of 74 million car tires, and points of sale in over 160 countries (around 20,000 in 2022).
Continental employs almost 200,000 people at 519 locations for production, research, and

development, and is present in 57 countries and markets. It has 917 company-owned tire outlets and a total of around 5,228 franchises and operations with a Continental brand presence.

62.     The U.S. Tire market is oligopolistic and highly concentrated, with three of the Defendants controlling the lion's share of the market: in 2022, Bridgestone, Michelin, and Goodyear (the "Big Three") made up almost 64 percent of the entire Replacement Tire market. Each of the Big Three also encompasses subsidiary brands: (i) Goodyear: Goodyear, Cooper Tires, Dunlop, and Kelly; (ii) Michelin: Michelin, BF Goodrich, and Uniroyal; and (iii) Bridgestone: Bridgestone and Firestone. Continental is fourth largest in terms of U.S. market share.



**Figure 3.**[6]

63.     In 2023, brands produced by the Big Three remained the most popular in the United States:

---

[6] Source: "The 'Goliaths' of the Replacement Tire Industry Are Getting Bigger. How Can The 'Davids' Compete?" Traqline (Feb. 14, 2022), *available at* https://www.traqline.com/newsroom/blog/the-goliaths-of-the-replacement-tire-industry-are-getting-bigger-how-can-the-davids-compete/.



**Figure 4.**[7]

64.     This high concentration makes the Replacement Tire market more susceptible to cartelization—a smaller group of competitors is better able to solve the coordination and trust problems that can prevent cartel formation or destabilize an existing cartel. A smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, to allocate market shares, to conceal their collusion, to develop enforcement mechanisms, and to detect and punish cheaters.

### D.  EC Investigation

65.     On January 30, 2024, the European Commission ("EC") revealed that it was carrying out unannounced inspections—also known as "dawn raids"—of tire producers. Under Article 20 of Regulation 1/2003, the EC is empowered to conduct dawn raids "on the premises of

---

[7] "Tire Market: Top Brands & Retailers, Market Share, Retail Sales Data, & Trends in 2023," Traqline (Oct. 20, 2023), *available at* https://www.traqline.com/newsroom/blog/tire-market-top-brands-retailers-market-share-retail-sales-data-trends-in-2023/.

companies suspected of being in breach of EU Competition rules."[8]

66.     When explaining the basis for the dawn raids, the EC expressed that it had "concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices . . . [and that] price coordination took place amongst the inspected companies, including via public communications."[9] The EC stated that the products at issue in the investigation are new replacement tires for passenger cars, vans, trucks, and buses.

67.     Shortly after the EC's announcement, Defendants confirmed that they were subjects to the investigation. Defendants made the following acknowledgments:

        a.   **Bridgestone:** "Bridgestone can confirm that the European Commission is conducting an inspection at its European headquarters."[10]

        b.   **Goodyear:** "We confirm that our European offices were subject to unannounced inspections today by the European authorities."[11]

        c.   **Continental:** "We can confirm that as of today, investigations by European antitrust authorities are taking place at Continental in Germany."[12]

        d.   **Nokian Tyres:** Nokian confirmed EC conducted an unannounced inspection at its headquarters in Finland and said, "The European Commission has expressed its concerns that the inspected tyre

---

[8] "Inspections," European Commission, *available at* https://competition-policy.ec.europa.eu/index/inspections_en.

[9] European Commission, "Commission carries out unannounced antitrust inspections in the tyres sector" (Jan. 30, 2024), *available at* https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

[10] Andrew Boyce and Tono Gil, "Bridgestone, Goodyear, Continental, Nokian confirm EU antitrust dawn raids." mLex (Jan. 30, 2024), https://content.mlex.com/#/content/1539333/bridgestone-goodyear-continental-nokian-confirm-eu-antitrust-dawn-raids-update

[11] *Id.*

[12] *Id.*

manufacturing companies may have violated EU antitrust rules that

prohibit cartels and restrictive business practices."[13]

    e.  **Pirelli:** Pirelli confirmed it was under investigation and that it was

"guaranteeing full support to the authority in the ongoing

investigations."[14]

    f.  **Michelin:** Michelin confirmed "it was included in the EU investigation."[15]

### E.  "Plus Factors" in the Replacement Tire Industry Provide Additional Evidence of a Conspiracy

68.    Prominent legal and economic antitrust scholars studying collusive behavior have

identified certain "plus factors," which are "economic actions and outcomes, above and beyond

parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but

largely consistent with explicitly coordinated action," and therefore support an inference of

collusion.[16] Each plus factor that is present constitutes a piece of circumstantial evidence

supporting active collusion, as opposed to mere conscious parallelism.

69.    Here, several plus factors support the plausible inference that Defendants are

members of an unlawful price fixing cartel. These include: (1) opportunities to collude; (2) high

barriers to entry; (3) a highly inelastic product; and (4) interchangeable products. Defendants are

also recidivist bad actors.

### 1.  Opportunities to Collude

70.    Defendants had numerous opportunities to meet and conspire under the guise of

---

[13] *Id.*

[14] Foo Yun Chee and Ilona Wissenbach, "Pirelli, Continental, Michelin and Nokian targeted in EU raids," Reuters (Jan. 31, 2024), *available at* https://www.reuters.com/business/autos-transportation/eu-antitrust-regulators-raid-tyre-makers-concerns-about-possible-cartel-2024-01-30/.

[15] *Id.*

[16] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. At least throughout the Class Period, the Replacement Tire industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of Replacement Tires, through trade association meetings and public communications.

71.     Each of the Defendants is a member of the U.S. Tire Manufacturers Association ("USTMA"). The USTMA is the national trade association for tire manufacturers that produce tires in the United States.

72.     Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA.

73.     The USTMA holds a number of annual conferences and meetings where Defendants had the opportunity to meet and discuss pricing. For example, the USTMA holds a spring and fall meeting for its board members annually, including on July 29, 2020, October 6, 2021, January 25, 2022, October 6, 2022, April 3–4, 2023, and October 11, 2023. Minutes from these regular meetings are not available to the public.

**2.  High Barriers to Entry and Exit**

74.     Replacement Tire manufacturers face significant entry and exit barriers that lead to market concentration, which facilitates collusion. Barriers to entry include large up-front capital investments to establish manufacturing plants that can produce Replacement Tires at scale. For example, Nokian recently completed a $360 million manufacturing facility in Dayton, Tennessee. These manufacturing plants need to be close enough to the end consumers to make shipping costs not prohibitive, as Replacement Tires are heavy products. Manufacturing plants must either have sophisticated and expensive automation or a large and expensive labor force. Established Replacement Tire manufacturers have also erected significant intellectual property protections through patented products.

75.     As to exit barriers, because a huge amount of investment is required to set up a manufacturing plant and to shift to new business, it is extremely difficult to exit from the Replacement Tire industry. For example, Uniroyal and Goodrich had to merge due to high exit barriers. Thus, consolidation is more likely than companies going out of business.

76.     Because the Replacement Tire market has high barriers to entry, it is more conducive to collusion. To maximize long-term profits, the cartel-fixed price must be sufficiently high to warrant participation in a criminal conspiracy but not so high as to lure new competitors into the market. When a market is protected by high barriers to entry, conspirators are better able to fix a high price with less worry that new firms will come into the market and bid the price down. In contrast, firms may not bother to conspire to fix prices if interlopers cannot be excluded from the market.

### 3.  Price Inelasticity

77.     The price elasticity of demand shows the responsiveness of the quantity demanded of a good relative to a change in its price. When a seller of goods or services can increase selling price without suffering a substantial reduction in demand, pricing is considered inelastic.

78.     Demand elasticity affects whether price fixing is likely to be profitable. When demand is inelastic, a seller with market power can charge a higher price without losing significant sales. This market characteristic encourages collusion because rivals can collectively raise price profitably.

79.     Replacement Tires are highly inelastic because tire replacement is not an option that can be deferred for long, particularly when a tire is damaged. Further, the cost of Replacement Tires makes up a small percentage of the operating cost of a car.

80.     Furthermore, Replacement Tires do not compete with other products in the

functional sense; consequently, there is no inter-industry competition through cross-elasticities of demand. Since the demand for Replacement Tires is derived from the need to use the automobile, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

81.     Because the price for Replacement Tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, Bridgestone America's chief operating officer reported: "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."

### 4.  Standardized Products with a High Degree of Interchangeability

82.     Defendants make similar models of Replacement Tires for each of the type-categories listed above (all-season, all-terrain, winter/snow, and summer tires). Within each type-category, Replacement Tires do not differ significantly in quality, appearance, or use—they are essentially commodity products. As a result, Replacement Tire models are functionally interchangeable.

83.     When purchasing a Replacement Tire, consumers can choose almost any brand on the market. Even when consumers are replacing only some of the four tires, they can use tires from different brands or models so long as certain features, such as tread depth, are similar. Thus, Replacement Tire "producers are not likely to be able to deviate much from the competitive price without losing sales."

84.     When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product like a Replacement Tire is interchangeable, economics suggests that cartel behavior is facilitated because cartel members can more easily monitor and detect defections from a price-

fixing agreement.

**5.   Defendants are Recidivist Violators of Antitrust Laws**

85.   The U.S. Tire industry for years has been highly concentrated, and there is a history of antitrust violations by Replacement Tire manufacturers.

86.   In 2008, the South African Competition Authority conducted search and seizure operations at the premises of Bridgestone, Dunlop, and the South African Tyre Manufacturers' Conference. These raids resulted in South African's competition authority issuing fines against Goodyear and Continental, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator.

87.   In 2019, Bridgestone and Continental were amongst the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.

<u>STATUTE OF LIMTATIONS</u>

88.   Class member purchases of Replacement Tires within four years prior to the filing of this Complaint are not barred by any applicable statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

89.   Plaintiff and the Class did not know and could not have known of Defendants' illegal conduct until the European Commission announced dawn raids in the tire industry on January 30, 2024. Before then, Plaintiff and the Class had no reason to believe that they paid prices for Replacement Tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

90.     Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Michelin attributed its 12% price increase on passenger and light truck replacement tires in 2022 to "market dynamics." Goodyear justified its July 1, 2022, price increase on consumer tires to rising raw-materials and other inflation-impacted costs. Pirelli justified its April 11, 2022, price increase to "changing market conditions."

91.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the various statutes of limitations governing the claims alleged herein were tolled at least until January 30, 2024, pursuant to the injury- discovery rule and the doctrine of fraudulent concealment.

92.     This complaint also alleges a continuing course of conduct (including conduct within the applicable limitations periods). Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action on his own behalf and on behalf of all others similarly situated as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2) and (b)(3), seeking injunctive relief pursuant to the Clayton Act and damages pursuant to the antitrust, unfair competition, and consumer protection laws of the states listed below, and as representatives of a Class defined as follows:

> All persons or entities that purchased not for resale one or more
> Replacement Tires manufactured by any Defendant from any
> entity that is not a Defendant nor owned by a Defendant within the
> United States from January 1, 2020, until the time that the adverse
> effects of Defendants' anticompetitive conduct ceased (the "Class
> Period").

94.     The class definition specifically excludes the following persons or entities: (a) any

of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; (e) the judges and chambers staff in this case, as well as any members of their immediate families; and (f) all jurors assigned to this case.

95.     Plaintiff does not know the exact number of Class members, but due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States, such that joinder of all Class members in the prosecution of this action is impracticable.

96.     Plaintiff's claims are typical of the claims of his fellow Class members because Plaintiff purchased Replacement Tires during the Class Period from an entity that is not a Defendant or owned by a Defendant. Plaintiff and all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

97.     Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

    a.   Whether Defendants contracted, combined, or conspired with one
         another to restrain trade of Replacement Tires at any time during the
         Class Period;

    b.   Whether Defendants' conduct caused the prices of Replacement Tires
         sold indirectly to consumers and other entities to be higher than the
         competitive level as a result of their restraint of trade;

    c.   Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

    d.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

98.    These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

99.    Plaintiff will fairly and adequately represent the interests of the Class because he purchased Replacement Tires indirectly from Defendants, not for resale, within the United States during the Class Period and has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

100.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

101.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation.

102.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

103.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## CLAIMS FOR RELIEF

### COUNT I

**Price Fixing in Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)**

**(Against All Defendants for Injunctive Relief Only)**

104.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

105.     Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of Replacement Tires sold within the United States.

106.     Defendants' activities constitute a *per se* violation of Section 1 of the Sherman Act.

107.     Plaintiff and the proposed Class request that the Court grant injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

108.     Plaintiff and members of the Class are threatened with future injury to their business and property unless the injunctive relief requested is granted.

### COUNT II

**Violations of
State Antitrust Laws**

**(Against All Defendants)**

109.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

110.     On account of the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires, Defendants have violated, and Plaintiff and members

28

of the Class are entitled to relief under, the antitrust laws of the states of Arizona, California, Colorado, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

     a.   Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*;

     b.   Cal. Bus. Code §§ 16700, *et seq.*;

     c.   Colo. Rev. Stat. § 6-4-101, *et seq.*;

     d.   Conn. Gen. Stat. §§ 35-27, *et seq.*;

     e.   D.C. Code §§ 28-4503, *et seq.*;

     f.   Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*;

     g.   740 Ill. Comp. Stat. §§ 10/3, *et seq.*;

     h.   Iowa Code §§ 553.5, *et seq.*;

     i.   Kan. Stat. Ann. §§ 50-112, *et seq.*;

     j.   Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*;

     k.   MD Code Ann., Com. Law, §§ 11-204, *et seq.*;

     l.   Mich. Comp. Laws Ann. §§ 445.773, *et seq.*;

     m.   Minn. Stat. §§ 325D.52, *et seq.* and Minn. Stat. §§ 8.31, *et seq.*;

     n.   Miss. Code Ann. §§ 75-21-3, *et seq.*;

     o.   Neb. Rev. Stat. §§ 59-802, *et seq.*;

     p.   Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*;

     q.   N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*;

     r.   N.M. Stat. Ann. §§ 57-1-2, *et seq.*;

s.   N.Y. Gen. Bus. Law § 340;

t.   N.C. Gen. Stat. §§ 75-2.1, *et seq.*;

u.   N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*;

v.   Or. Rev. Stat. §§ 646.730, *et seq.*;

w.   R.I. Gen. Laws §§ 6-36-5, *et seq.*;

x.   S.D. Codified Laws §§ 37-1-3.2, *et seq.*;

y.   Tenn. Code Ann. §§ 47-25-101, *et seq.*;

z.   Utah Code Ann. §§ 76-10-3104, *et seq.*;

aa.  Vt. Stat. Ann. 9, §§ 2453, *et seq.*;

bb.  W.Va. Code §§ 47-18-4, *et seq.*; and

cc.  Wis. Stat. §§ 133.03, *et seq.*

111.   Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in herein. Their injuries consist of paying higher prices for Replacement Tires than they would have paid in the absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent and flow from Defendants' conduct unlawful.

112.   Plaintiff and the proposed Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT III

### Violations of State
### Unfair and Trade Practices Laws

### (Against All Defendants)

113.   Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

114.    Defendants engaged in unfair competition and unfair/unconscionable or deceptive acts or practices in violation of the state consumer protection statutes identified below by entering into the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

115.    To the extent deception is required under the state laws below, Defendants concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

116.    Accordingly, consumers and other indirect purchasers of Replacement Tires were induced into purchasing, and will continue to purchase, Replacement Tires at inflated prices. Plaintiff and members of the Class could not reasonably have avoided injury from Defendants' wrongful conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly flows from Defendants' unlawful conduct. Defendants' conduct occurred in connection with consumer transactions related to the availability and sale of Replacement Tires.

117.    Defendants have violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the states of Arkansas, California, Connecticut, Florida, Idaho, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Utah and Vermont, as well as the District of Columbia, as follows:

       a.    Ark. Code Ann.§§ 4-88-101, *et seq.*;

       b.    Cal. Bus. & Prof Code §§ 17200, *et seq.*;

       c.    Conn. Gen. Stat. §42-110a, *et seq.*;

       d.    D.C. Code §§ 28-3901, *et seq.*;

e.   Fla. Stat. §§ 501.201, *et seq.*;

f.   Idaho Code §§ 48-601, *et seq.*

g.   Mass. Gen. Laws ch. 93A, *et seq.*;

h.   Mo. Rev. Stat. §§ 407.010, *et seq.*;

i.   Mont. Code Ann., §30-14-103, et seq., and §30-14-201, *et seq.*;

j.   N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

k.   N.Y. Gen. Bus. Law §§ 349, *et seq.*;

l.   N.C. Gen. Stat. §§ 75-1, *et seq.*;

m.   R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

n.   S.C. Code Ann. §39-5-10, *et seq.*;

o.   Utah Stat. §§ 13-11-1, *et seq.*; and

p.   VT. Stat. Ann., tit. 9, §2451, *et seq.*

## <u>COUNT IV</u>

### Unjust Enrichment

### (Against All Defendants)

118.   Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

119.   Alternatively, from the acts of Defendants as alleged above, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

120.   Through Defendants' combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires, Defendants have artificially increased the price of Replacement Tires charged to Plaintiff and members of the Class.

121.   Defendants have collected from Plaintiff and members of the Class artificially high earnings from the sale of Replacement Tires.

122.     Defendants have been unjustly enriched by retaining the artificially high earnings from the sale of Replacement Tires collected from Plaintiff and members of the Class.

123.     The retention of these earnings by Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the Class.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court enter judgment on his behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.     This action may proceed as a class action, with Plaintiff serving as the Class Representative and his counsel serving as Class Counsel;

B.     Defendants have contracted, combined, and conspired in violation of the Sherman Act and various state laws;

C.     Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

D.     Plaintiff and the Class are entitled to treble damages (*i.e.,* three times overcharges) in an amount to be determined at trial, plus interest, in accordance with law;

E.     Plaintiff and the Class are entitled to equitable relief suitable to remedy Defendants' past and ongoing restraint of trade, including:

i.     A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

ii.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and

the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

F.      Defendants are jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class members; and

G.      Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and Plaintiff and the Class receive such other or further relief as may be just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 26, 2024

Respectfully submitted,

*/s/ Gregory S. Asciolla*

Gregory S. Asciolla
Robin A. van der Meulen
Jonathan S. Crevier
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
rvandermeulen@dicellolevitt.com
jcrevier@dicellolevitt.com